**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| TRANSAMERICA LIFE INSURANCE COMPANY, | : : : | **Civil Action No. 18-10869 (SRC)** |
| Plaintiff, | : : | **OPINION** |
| v. | : : | |
| DAIBES GAS HOLDINGS ATLANTA, L.L.C. et al., | : : : | |
| Defendants. | : | |

**CHESLER, District Judge**

This matters comes before the Court on two motions for summary judgment: 1) the motion by Plaintiff Transamerica Life Insurance Company ("TLI"); and 2) the motion by Defendants/Counterclaim Plaintiffs Fred A. Daibes ("Daibes"), Daibes Gas Holdings Atlanta, L.L.C. ("DGHA"), Reb Oil of Alabama, LLC ("Reb Oil"), 1096-1100 River Road Associates, L.L.C. ("RRA"), Lyndhurst Residential Communities, LLC ("LRC") and Portside Gorge Associates, L.L.C. ("PGA") (collectively, "Defendants"). For the reasons that follow, Plaintiff's motion will be granted, and Defendants' motion will be denied.

The parties do not dispute the following facts. TLI is an insurance company and Daibes is a real estate developer. This action concerns five loans (collectively, the "Loans") that TLI made to various Defendants for real estate development and investment between 2004 and 2008. As summarized by Defendants:

> Five loans ("the Loans") are at issue in this lawsuit, each evidenced by a secured promissory note: the note executed by PGA in December 2004 for $52 million ("the First St. Moritz Note"); the note executed by DGHA in December 2007 for $17.5 million ("the DGHA Note"); the note executed by Reb Oil in December

1

2007 for $13.5 million ("the Reb Oil Note"); the note executed by RRA in November 2011 for $69.6 million ("the Alexander Note"); and the note executed by PGA in June 2014 for $3.5 million ("the Third St. Moritz Note") (collectively, "the Notes").

(Defs.' MSJ Br. at 3.)   The First and Third St. Moritz Notes, collectively, are referred to as the "Remaining St. Moritz Notes."   The loans to DGHA and Reb Oil are referred to as the "Gas Station Loans."   Daibes executed a personal guarantee as a condition of each loan (the "Guarantees.")   Between 2012 and 2014, the parties amended and modified the loan agreements; notably, the Loans became subject to cross-default provisions.

On April 26, 2018, Plaintiff sent Defendants the Partial Waiver Letter.   (Voss. Cert. Ex. 23.)   In this letter, Plaintiff partially waived its rights under certain of the provisions at issue in this case: 1) the Alexander Note prepayment premium provision was partially waived, with the effect of making the Alexander Note prepayment premium provision functionally identical to those provisions in the DGHA and Reb Oil Notes; and 2) the default interest provisions of the DGHA and Reb Oil Notes were partially waived, with the effect that the default interest rate was set at 10% over the contract rate in those Notes.   There is no dispute over the effect of the Partial Waiver Letter on these provisions.   (Pl.'s 56.1 Stmt ¶¶ 104-106, 117; Defs.' Resp. 56.1 Stmt ¶¶ 104-106, 117.)   For convenience, in this Opinion, this Court will refer to the provisions "in the Notes," but this shall be understood to mean: the provisions in the Notes, as modified by the Partial Waiver Letter.

On June 15, 2018, Plaintiff declared the Gas Station Loans in default and accelerated the entire indebtedness; Plaintiff filed the Complaint initiating the present action shortly after.   On November 8, 2018, Plaintiff did the same with the remaining loans, and filed an Amended Complaint later that month.   On February 1, 2019, Plaintiff filed an action in the Chancery Division of the Superior Court of New Jersey to foreclose on the only remaining collateral for

the Loans, the Alexander Apartments.   On February 12, 2020, the Superior Court filed the "Foreclosure Decision," accompanied by the "Foreclosure Order," in which it granted Plaintiff's motion for partial summary judgment, denied Defendants' motion for summary judgment, and struck Defendants' answer; the court ordered that Plaintiff had the right to foreclose on the mortgages at issue and referred the case to the Superior Court's Office of Foreclosure for handling as an uncontested foreclosure.

The Amended Complaint asserts eight claims.   Four of the claims are for breach of contract with regard to one or more loans: First Count (against DGHA for breach of the DGHA Mortgage and DGHA Note); Third Count (against Reb Oil for breach of the Reb Oil Mortgage and Reb Oil Note); Fifth Count (against RRA for breach of the Alexander Note); and Seventh Count (against RRA for breach of the First St. Moritz Note and the Third St. Moritz Note). Four of the claims are against Daibes for breach of contract with regard to the Guarantees: Second Count (the DGHA Guarantee); Fourth Count (the Reb Oil Guarantee); Sixth Count (the Alexander Guarantee); and Eighth Count (the St. Moritz Guarantee).   Defendants have filed four Counterclaims which seek declaratory judgments that the prepayment premium provisions and the default interest provisions in all of the Notes are unreasonable and unenforceable.

Plaintiffs move for partial summary judgment as to three matters: 1) Defendants are liable for breach of contract; 2) Plaintiffs are entitled to contract damages pursuant to the terms of the contracts; and 3) as to the Counterclaims, judgment should be entered in favor of Plaintiffs.   Defendants move for summary judgment on their Counterclaims, and on two issues pertaining to Plaintiff's damages claims: 1) recovery of certain property tax advances is time-barred; and 2) attorneys' fees are limited by a New Jersey Court Rule.   Defendants' brief in opposition to Plaintiff's motion incorporates by reference the arguments in Defendants' briefs in

support of their motion for summary judgment.

## I. Plaintiff's motion for summary judgment: liability

Plaintiff first argues that collateral estoppel, based on the Foreclosure Decision, bars

Defendants from contesting liability for breach of contract, as to the First, Third, Fifth, and

Seventh Counts.   The parties do not dispute that the Third Circuit has summarized the basic

principles for the application of collateral estoppel under New Jersey law as follows:

> In New Jersey, when a judgment of a court of competent jurisdiction determines a
> question in issue, the judgment estops the parties and privies from relitigating the
> same issue in a subsequent proceeding.   Such a determination is conclusive on
> either the same or a different claim.
>
> New Jersey courts apply a five-pronged test to determine whether collateral
> estoppel should bar relitigation of an issue: (1) the issue must be identical; (2) the
> issue must have actually been litigated in a prior proceeding; (3) the prior court
> must have issued a final judgment on the merits; (4) the determination of the issue
> must have been essential to the prior judgment; and (5) the party against whom
> collateral estoppel is asserted must have been a party or in privity with a party to
> the earlier proceeding.

Del. River Port Auth. v. FOP, Penn-Jersey Lodge 30, 290 F.3d 567, 573 (3d Cir. 2002) (citations

omitted).

Plaintiffs argue that, here, the requirements for the application of collateral estoppel are

met.   Plaintiffs contend that, when the Superior Court granted Plaintiffs' motion for summary

judgment in the Foreclosure Action, "the Chancery Division held that the Loan Documents were

valid and enforceable, Defendants had defaulted, and Plaintiff had the right to foreclose, struck

Defendants' answer and affirmative defenses, and referred the matter to the Office of

Foreclosure as uncontested."   (Pls.' Br. 9-10.)   This is an accurate summary of the conclusions

stated in the Foreclosure Decision.   (Hartmann Cert. Ex. 32; Reich Dec. Ex. O.)   Plaintiffs then

argue:

> In short, the issues in both cases (validity of the contracts, consideration,

> Defendants' defaults, Defendants' defenses, and Plaintiff's right to enforce the documents) are identical; were litigated and decided by the Chancery Division; the determination was essential to the prior judgment; and the parties were the same. This ruling unequivocally satisfies the elements of collateral estoppel.

(Pls.' Br. 10.)   As a result, Plaintiffs argue that Defendants should be estopped from relitigating the elements of breach of contract, "including Defendants' defenses to validity and breach of the Notes and Modifications."   (Id. at 11.)

Although Defendants oppose Plaintiffs' position on collateral estoppel, Defendants' opposition brief does not dispute the third, fourth and fifth elements of the Delaware River five-pronged test.   As to the first and second elements, Defendants make three arguments: 1) the instant case was filed first, relative to the Foreclosure Action, and does not qualify as a later case; 2) certain issues in the present case were not litigated in the prior action, so the issues are not identical and actually litigated in the prior action; and 3) fairness demands that Defendants have the opportunity to litigate liability in this Court.

A.  Is this a later case?

Defendants first argue that, because this case was filed first, relative to the Foreclosure Action, it does not qualify as a later case.   This is meritless: the Delaware River standard says nothing about which case was filed first.   See Old Colony Tr. Co. v. Commissioner, 279 U.S. 716, 728 (1929) ("Whichever judgment is first in time is necessarily final to the extent to which it becomes a judgment.")   As to the sequence of the cases, the standard bars relitigation when the identical issue was litigated in a prior proceeding, and the prior court issued a judgment on the merits in what is now a prior proceeding.   There is no sequence problem.

B.  Were the identical issues actually litigated?

As to the first and second elements, Defendants argue that certain issues in the present action were not identical as well as actually litigated in the Foreclosure Action: 1) there was no

litigation of any of the Guarantee agreements, which is undisputed;[1] and 2) an affirmative defense to liability was not litigated: "that Plaintiff created the situation which doomed the Alexander and St. Moritz Loans to failure because the cash flow from The Alexander was obviously insufficient to service the Gas Station Loans as well" (hereinafter, the "Proposed Affirmative Defense.")   (Defs.' Opp. Br. 9.)

This Court take judicial notice, pursuant to Federal Rule of Evidence 201(b)(2), of the filings in the Superior Court foreclosure case, which are publicly available on the official website of the New Jersey Courts.   <u>Transamerica Life Insurance Co. et al. v 1096-1100 River Road Assoc., LLC et al.</u>, No. F-002369-19 (N.J. Super Ct., Chanc. Div.)   On August 14, 2019, Defendants filed their Contesting Answer to the Second Amended Complaint, stating 21 affirmative defenses, summarized here: 1) failure to state a claim; 2) statute of limitations; 3) unreasonable under the law; 4) illegal and unconscionable penalty; 5) failure to satisfy conditions precedent to repayment; 6) Plaintiffs failed to substantially perform; 7) Plaintiffs failed to mitigate damages; 8) Plaintiffs have no damages; 9) barred "by the doctrines of estoppel, waiver, ratification, laches, unclean hands, unjust enrichment, accord and satisfaction, recoupment, acquiescence, and/or illegality;" 10) Plaintiff's alleged damages are subject to setoff; 11) lack of subject matter jurisdiction; 12) entire controversy doctrine; 13) doctrine of *res judicata*; 14) doctrine of collateral estoppel; 15) failure to join a necessary party; 16) Defendants did not breach any duty; 17) no default occurred under the mortgages and notes; 18) Plaintiffs have no right to foreclose; 19) lack of consideration; 20) statute of frauds; and 21) reserve the right to amend and add defenses.

---

[1] Plaintiffs do not assert collateral estoppel with regard to any of the claims for breach of the Guarantees.

The Foreclosure Decision shows that, when the Superior Court decided both Plaintiff's and Defendants' motions for summary judgment, the Court considered the defenses raised by Defendants and stated: "This Court rejects Defendants' arguments." (Hartmann Cert. Ex. 32 at 16.) In the Foreclosure Order, the Superior Court ordered that "Defendants' Answer and all affirmative defenses asserted therein, as to the SAC, is hereby stricken." (Hartmann Cert. Ex. 33 at ₱ 5.)

The Superior Court granted Plaintiff's motion for summary judgment "as to liability on all counts of the second amended foreclosure complaint." (Id. at 2.) The Court ordered that Plaintiff had the right to foreclose on the Senior Mortgage and the Junior Mortgage. (Id. at ₱₱ 2, 3.) The Court summarized the relevant law as follows:

> Under New Jersey law, the only material issues to be established in a foreclosure proceeding are that (i) the mortgage and loan documents are valid; (ii) the mortgage is in default; and (iii) as a result of the default there is a contractual right to foreclose.

(Hartmann Cert. Ex. 32 at 11.) The Court also summarized Defendants' principal argument against foreclosure, that Plaintiff had not demonstrated a right to foreclose on the mortgages. (Id. at 10.) The Court explained that Defendants' position, in brief, was that the various loan modifications did not operate to "amend the obligations secured by the mortgages to include the [DGHA] Loan and the Reb Oil Loan." (Id.) "Defendants dispute that the Senior Mortgage and the Junior Mortgage are in default because, according to Defendants, the alleged defaulted obligations are not secured by the Senior Mortgage or the Junior Mortgage." (Id. at 12.) Defendants thus challenged the legal effect of the modifications which added the cross-default provisions and Plaintiff's right to cross-default the Alexander and Remaining St. Moritz Loans.

The Superior Court decided, in short, that the various loan modifications and the cross-default provisions were valid and enforceable, and that the defaults on the DGHA and Reb Oil

loans entitled Plaintiff to foreclose on the Junior and Senior Mortgages.   As already stated, the Superior Court granted Plaintiff's motion for summary judgment "as to liability on all counts of the second amended foreclosure complaint."   (Id. at 2.)   The first two counts in the state court second amended foreclosure complaint are of particular relevance here.   In the First Count, Plaintiff alleged that Defendants had defaulted under the DGHA and Reb Oil Notes, and that, by operation of cross-collateralization provisions in the subsequent modifications, and their refusal to remit the indebtedness due, Defendants had defaulted under the Alexander Note, and Plaintiff had the right to foreclose.   (Sup. Ct. Sec. Am. Compl. ¶¶ 114-118.)   In the Second Count, Plaintiff alleged that Defendants had defaulted under the Remaining St. Moritz Notes by operation of the modifications and their refusal to remit the indebtedness due, and Plaintiff had the right to foreclose.   (Sup. Ct. Sec. Am. Compl. ¶¶ 129-130.)   These are the issues that were actually litigated in the Superior Court, and as to which the Superior Court issued a final judgment on the merits.

As already stated, in the present case, Defendants did not contest Plaintiffs' assertion that the third, fourth, and fifth prongs of the Delaware River collateral estoppel have been met.   As to the third prong, this Court finds that the prior court issued a judgment on the merits that is sufficiently firm to be considered final for the purpose of collateral estoppel.   Hills Dev. Co. v. Bernards, 103 N.J. 1, 59 (1986) ("the doctrine of collateral estoppel applies whenever an action is 'sufficiently firm to be accorded conclusive effect'" (quoting Restatement (Second) of Judgments, § 13 at 132)); Reid v. N.J. Mfrs. Ins. Co., 2020 N.J. Super. Unpub. LEXIS 411, at *10 (N.J. Super. Ct. App. Div. Feb. 27, 2020) ("'final judgment' includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect.")

As to the fourth prong, in the Foreclosure Decision, the Superior Court of New Jersey explained that, under New Jersey law, the material issues in a foreclosure action are: the validity of the mortgage and loan documents, the mortgage is in default, and, as a result of the default, there is a right to foreclose.   (Foreclosure Decision at 11).   The court struck Defendants' Answer as non-contesting, as well as all affirmative defenses in the Answer.   (Hartmann Cert. Ex. 33 at ¶ 5.)   Under the applicable state law,[2] "the essential elements of a cause of action for a breach of contract [are]: a valid contract, defective performance by the defendant, and resulting damages."   Coyle v. Englander's, 199 N.J. Super. 212, 223 (N.J. Super. Ct. App. Div. 1985). The determination that Defendants had defaulted on valid mortgages and loans, resulting in a right to foreclose, rested on essential determinations that the mortgages and loans were valid contracts, and that Defendants' performance, having defaulted, was defective.

As to the fifth element, the parties to the present and prior cases are the same.

This Court concludes that Plaintiff has demonstrated that, under Third Circuit law, the requirements for the application of collateral estoppel have been met, as to the issues actually litigated before the Superior Court.   Defendants argue, however, that, in the present action, they assert an affirmative defense that was not actually litigated before the Superior Court, the Proposed Affirmative Defense.

Defendants state that the Proposed Affirmative Defense was disclosed in this case in Defendants' Supplemental Answers to Plaintiffs' First Set of Interrogatories, which states: "Finally, Defendants assert that a default under each of the DGHA and Reb Oil loans was the purpose — and an invalid one — of Plaintiffs' actions, since it was inevitable, given that the

---

[2] The Reb Oil Note is governed by Alabama law and the DGHA Note is governed by Georgia law.   Plaintiffs contend that, as to the elements of breach of contract, the laws of New Jersey, Alabama, and Georgia do not materially differ.   Defendants have not disputed this.

cash flows from the Alexander were insufficient to service those loans, which Plaintiffs well

knew."   (Reich Dec. Ex. 2 at 6.)   The opposition brief further claims that, in the subsection of

the brief that follows, the Proposed Affirmative Defense is "discussed at length."   (Defs.' Opp.

Br. 9.)

The subsection which follows asserts that the Alexander and St. Moritz loans were fully

performing when TLI "elected" to put them into default, and that there was "no good reason" to

do so, though Plaintiffs acknowledge that they were "technically defaulting" under the cross-

default provisions in certain modification agreements.   (Defs.' Opp. Br. 10.)   At the outset,

then, the Court makes two observations: 1) the Proposed Affirmative Defense does not apply to

the breach of contract claims in the First and Third Count, which relate to the Gas Station Loans;

and 2) as to the Fifth and Seventh Counts, Defendants concede that the Alexander and St. Moritz

loans were legally in default pursuant to the terms of certain valid agreements.

Defendants present the following summary of their case in support of the Proposed

Affirmative Defense:

> Through its series of missteps with the Gas Station Loans – allowing collateral to
> be (improperly) held in its own corporate stock, diverting some of that collateral
> to service another loan, rejecting substitute collateral, and inadequately
> underwriting the CCCD Agreement – Plaintiff did precisely what the foregoing
> case law prohibits: it took advantage of a technical default under the Alexander
> and St. Moritz Loans to accelerate $83 million in principal outstanding.   Those
> Loans were fully-performing and the collateral underlying them was unimpaired.
> Because the default "is a technical one which does not put [Plaintiff] at risk" and
> acceleration of the amounts due thereunder "would be unjust in light of the harm
> that would accrue to" Defendants, that accelerated indebtedness under the
> Alexander and St. Moritz Loans should not be used as a basis to award damages
> to Plaintiff.   *Prime Motor Inns*, 131 B.R. at 236.

(Defs.' Opp. Br. 15.)   Even before this Court considers whether the Proposed Affirmative

Defense was actually litigated before the Superior Court, there are a few significant problems

with it.

The first problem is one of understanding exactly how the Proposed Affirmative Defense works as an affirmative defense to liability for breach of contract under New Jersey law, which governs the Alexander and St. Moritz Notes.   It is clear that Defendants contend that Plaintiffs' acceleration of the amounts due on the Alexander and Remaining St. Moritz Notes, based on a technical default, under circumstances which Plaintiffs had a role in creating, should be found to be "unjust."   In their final sentence, Plaintiffs appear to contend that this Court, having found that the acceleration was unjust, should bar the award of damages flowing from the loan amounts unjustly accelerated; Defendants then cite Prime Motor Inns.

The case of Prime Motor Inns, heard in a federal Bankruptcy Court in Florida, does not support Defendants' position; to the contrary, it highlights the problems with the Proposed Affirmative Defense.   In Prime, the Bankruptcy Court had before it an application for a temporary restraining order: the borrower plaintiff sought an injunction temporarily excusing it from compliance with a provision in the loan agreement with the lender defendant, because compliance had been delayed by the bankruptcy of the borrower's accountant, and also enjoining the lender from declaring default based on the non-compliance and accelerating the amount due. In re Prime Motor Inns, 131 B.R. 233, 235 (Bankr. S.D. Fla. 1991).   The Prime court granted the application, explaining that it was exercising the equitable powers authorized by the Bankruptcy Code:

> Other courts of equity recognize that, under certain circumstances, an acceleration of a debt is a harsh remedy and exercise their equitable powers to prevent inequitable results.
> . . .
> In this case, equity precludes Defendant from accelerating the loan. The breach which gave rise to Defendants' right to accelerate did not impair Defendants' security or ability to recover on the loan.

Id. at 236.

Prime is entirely different from the case presently before this Court.   First, this Court is not presently considering a borrower's application for equitable relief, to bar acceleration of a loan, but a lender's motion for summary judgment of liability for breach of contract following default and a state court judgment of foreclosure.   The acceleration of the loans took place years ago.   The present matter is an action at law for money damages pursuant to a contract. Defendants' Counterclaims seek declaratory judgments challenging the reasonableness of provisions related to the calculation of the money damages – not equitable relief.   This Court does not see how Prime has any relevance to an action at law for contract damages after a judgment of foreclosure.

Second, Prime was decided under federal Bankruptcy law.   Defendants allege improper acceleration of the Alexander and Remaining St. Moritz Notes.   There is no dispute that the Alexander Note and St. Moritz Notes are governed by New Jersey law.   Federal bankruptcy law has no relevance to the instant case.

This leads to the next problem: Defendants do not provide support for the proposition that the Proposed Affirmative Defense has a basis in New Jersey law.   In not one of the cases cited by Defendants did a court hold that, under New Jersey law, "improper" acceleration of a loan is a defense against liability for breach of contract.   The case of Windsor Shirt Co. v. N.J. Nat'l Bank, 793 F. Supp. 589, 604 (E.D. Pa. 1992), does not provide the support that Defendants claim.   That court did not have before it a question of whether to impose a contractual penalty based on a technical default.[3]   While Brown v. Avemco Inv. Corp., 603 F.2d 1367, 1379 (9th

---

[3] Defendants have also overlooked the context in which the Windsor court stated that a court could not decide, purely as a matter of law, whether a default was technical.   At issue was a question of whether the defendant bank had misrepresented its policy about technical defaults, and the only case cited in support applied the Missouri U.C.C.

Cir. 1979), does deal with the issue of accelerating of a note based on a technical default, that case was decided under the Texas U.C.C.   See also Neuro-Rehab Assocs., Inc. v. AMRESCO Com. Fin., L.L.C., 2006 WL 1704258, at *4 (D. Mass. June 19, 2006) (applying Idaho law).

The only case cited by Defendants, in support of the Proposed Affirmative Defense, in which a court considered New Jersey law in a dispute between a lender and a borrower is Nat'l Westminster Bank NJ v. Lomker, 277 N.J. Super. 491, 493 (N.J. Super. Ct. App. Div. 1994), but Westminster has nothing to do with acceleration of a loan amount.   Instead, Westminster stands for the uncontroversial proposition that a court must not grant a motion for summary judgment on defendant's affirmative defenses if the non-movant offers evidence that raises a material factual dispute.   Id. at 496.   The relevant substantive law was New Jersey's implied covenant of good faith and fair dealing, and Defendants here have not pled any counterclaim for breach of the implied covenant.[4]   Id.   Defendants have shown no basis for the Proposed Affirmative Defense in New Jersey law.

In reply, Plaintiffs struggle a bit to figure out exactly what affirmative defense Defendants have raised – understandably, since Defendants have avoided using any labels in discussing it, nor cited any cases which clearly recognize a defense resembling the Proposed Affirmative Defense under New Jersey law.   Plaintiffs conjecture that "Defendants appear to assert a combination of economic duress and unclean hands."   (Pls.' Reply 4.)

As to economic duress, under New Jersey law, a mortgage may be declared void if it was given under economic duress.   Cont'l Bank of Pa. v. Barclay Riding Acad., 93 N.J. 153, 175

---

[4] In any case, under New Jersey law, the duty of fair dealing "may not be invoked by a commercial debtor to preclude a creditor from exercising its bargained-for rights under a loan agreement."   Glenfed Fin. Corp., Commercial Fin. Div. v. Penick Corp., 276 N.J. Super. 163, 175 (N.J. Super. Ct. App. Div. 1994).

(1983).   Defendants have not, however, sought to void any of the agreements at issue, nor have they made any reference to the affirmative defense of economic duress.

The equitable defense of unclean hands has a much better fit with Defendants' arguments about the Proposed Affirmative Defense in their opposition brief, which follow the theme that Plaintiff bears some responsibility for the default of the Alexander and Remaining St. Moritz Notes, and that the acceleration of the amounts due was improper.   Defendants' final statement of the Proposed Affirmative Defense has a very strong equitable flavor: "Because the default is a technical one which does not put [Plaintiff] at risk and acceleration of the amounts due thereunder would be unjust in light of the harm that would accrue to Defendants, that accelerated indebtedness under the Alexander and St. Moritz Loans should not be used as a basis to award damages to Plaintiff.   (Defs.' Opp. Br. 15.)   Defendants' argument here does appear to be that the acceleration was unjust, and that the Court should remedy that injustice by declining to award damages based on the accelerated loans.   The citation to <u>Prime</u>, a case in which that court expressly exercised its equitable powers, supports the idea that the Proposed Affirmative Defense is equitable in nature.

As Plaintiffs argue in the reply brief, the problem for Defendants is that New Jersey law does not allow equitable defenses to defeat a claim at law for purely monetary damages.   <u>Tarasi v. Pittsburgh Nat'l Bank</u>, 555 F.2d 1152, 1156 n.9 (3d Cir. 1977) ("Since the plaintiffs in this appeal only seek damages, the 'unclean hands' doctrine is not relevant"); <u>McAdam v. Dean Witter Reynolds, Inc.</u>, 896 F.2d 750, 756 n.10 (3d Cir. 1990) ("Since McAdam in this appeal only seeks damages, the unclean hands doctrine is not applicable.")   This is consistent with the traditional principles of the law/equity distinction which are fundamental to New Jersey law, summed up in the familiar legal maxim: "Here, as in all cases, equity follows the law."   <u>Berg v.</u>

14

Christie, 225 N.J. 245, 280 (2016).  "[E]quity will generally conform to established rules and precedents, and will not change or unsettle rights that are created and defined by existing legal principles."  W. Pleasant-CPGT, Inc. v. U.S. Home Corp., 243 N.J. 92, 108 (2020).

When, as here, a party pursues a claim at law for money damages under New Jersey law, equity will not change the rights created by the law.  Defendants have cited no authority for the proposition that New Jersey law would recognize the Proposed Affirmative Defense as a valid affirmative defense to liability for breach of contract.  Because there is no legal basis to consider the Proposed Affirmative Defense a valid affirmative defense, its assertion can neither raise a material factual dispute nor defeat Plaintiffs' motion for summary judgment of liability for breach of contract.

Moreover, the Proposed Affirmative Defense, as explained by Defendants in their opposition, appears to be merely a variation on the themes of the ninth affirmative defense presented to the Superior Court in Defendants' Contesting Answer to the Second Amended Complaint, which asserted that Plaintiff's claims are barred "by the doctrines of estoppel, waiver, ratification, laches, unclean hands, unjust enrichment, accord and satisfaction, recoupment, acquiescence, and/or illegality."  This list of equitable defenses has a very broad sweep, and the Proposed Affirmative Defense easily comes within its scope.  This Court finds that the Proposed Affirmative Defense is a variant of the unclean hands defense which was actually litigated before the Superior Court, and the Superior Court issued a judgment in which it struck all of Defendants' affirmative defenses.   Defendants have no viable basis for contending that the Proposed Affirmative Defense was not actually litigated in the prior action, which resulted in a judgment against them.  Furthermore, even if there were some basis to contend that the Proposed Affirmative Defense was not actually litigated, as an equitable defense asserted against

a claim for money damages, it is barred by New Jersey law.

      C.  <u>Is the application of collateral estoppel unfair?</u>

Third, Defendants argue that this Court should decline to apply collateral estoppel because, under the circumstances of this case, it is unfair to do so.   The New Jersey Supreme Court has stated that, as an equitable doctrine, collateral estoppel will not be applied when it is unfair to do so.   <u>Olivieri v. Y.M.F. Carpet, Inc.</u>, 186 N.J. 511, 521 (2006).   In brief, Plaintiff argues that it is unfair to apply the doctrine here because: 1) the record is fuller now than when the Foreclosure Action was decided; 2) the Foreclosure Action was decided on an incomplete record; 3) Plaintiffs gave no advance notice to Defendants that it would argue collateral estoppel; and 4) Plaintiffs are attempting to bar Defendants "from finishing what Plaintiff itself started." (Defs.' Opp. Br. 8.)   This Court finds none of these arguments to be persuasive.   They are all rather abstract and vague,[5] with no specifics about, for example, what essential piece of evidence was missing from the record before the state court in the Foreclosure Action.

Defendants finish their unfairness argument with a quote from the New Jersey Supreme Court that might have served as a starting point for a public policy argument: "collateral estoppel is not mandated by constitution or statute and is a doctrine designed to accomplish various goals, a rule not to be applied if there are sufficient countervailing interests."   <u>Hills Dev. Co. v.</u>

---

[5] Plaintiff, in reply, cites <u>Gannon v. Am. Home Prods., Inc.</u>, 211 N.J. 454, 480 (2012).   As Plaintiff acknowledges, <u>Gannon</u> must be considered cautiously, as in that case, the New Jersey Supreme Court applied collateral estoppel under federal law, not New Jersey law.   Thus, while that case is not controlling authority on an issue of collateral estoppel under New Jersey law, the Court commented on the similarities between the two, most notably the principle that a court may decline to afford preclusive effect to collateral estoppel when it is inequitable to do so.   <u>Id.</u> at 476.   The Court counseled that courts must be careful in applying the equitable considerations contained in the Restatement (Second) of Judgments to a case: "They must not regard those considerations to be a license to substitute generalized concerns about the imposition of collateral estoppel when the clearly established elements have been met."   <u>Id.</u> at 480.

Bernards, 103 N.J. 1, 59 (1986) (citation omitted).   Defendants have pointed to no

countervailing interests, nor have they considered the various goals that the New Jersey Supreme

Court has emphasized in the case law.   As the Court explained in a more recent case:

> Fundamental to the application of estoppel is an assessment of considerations
> such as finality and repose; prevention of needless litigation; avoidance of
> duplication; reduction of unnecessary burdens of time and expenses; elimination
> of conflicts, confusion and uncertainty; and basic fairness.   Indeed, such broader
> notions about fairness and finality echo in the variety of considerations that equity
> applies in estoppel-like circumstances.

Winters v. N. Hudson Reg'l Fire & Rescue, 212 N.J. 67, 85 (2012) (citations omitted).

Defendants' arguments do not persuade this Court that any of these considerations weigh in

favor of declining to give preclusive effect to the Foreclosure Decision.   To the contrary, it is in

the interests of finality, prevention of needless litigation, avoidance of duplication, and reduction

of unnecessary burdens of time and expenses, to give preclusive effect to the Foreclosure

Decision.

Defendants also argue: "Plaintiff's abrupt departure from the parties' well-established

course of dealing at least raises a triable issue as to the legitimacy of the Alexander and St.

Moritz defaults."   (Defs.' Opp. Br. at 18.)   The Court need not consider the factual allegations

and evidence supporting this because Defendants offer no legal basis whatever for this argument.

Defendants rely on two cases which do not help them at all.   The cited aspect of Premier Health

Ctr., P.C. v. UnitedHealth Grp., 2012 WL 1135608, at *10 (D.N.J. Apr. 4, 2012), deals with the

question of whether a course of conduct effected a waiver of an anti-assignment clause.   As

already discussed, the cited part of Windsor Shirt, 793 F. Supp. at 604, deals with a claim of

misrepresentation, not an affirmative defense to a breach of conduct claim.   The Court finds no

legal foundation for this argument.

The Court concludes that Plaintiff has demonstrated that the requirements for the

application of collateral estoppel have been met.   In the prior action, the Superior Court

determined, and issued a judgment, that Defendants were liable for breach of the DGHA, Reb

Oil, Alexander, and Remaining St. Moritz loan agreements.   This Court finds that, as to the

claims for breach of contract in the First, Third, Fifth, and Seventh Counts, the issues of liability

are identical to the issues that were actually litigated in the prior proceeding.   Plaintiffs have

demonstrated that the requirements for collateral estoppel under New Jersey law have been met,

and Defendants are barred from contesting liability for breach of contract as to the First, Third,

Fifth, and Seventh Counts.

The Foreclosure Decision did not involve any of the Guarantees, and so collateral

estoppel has no application to the breach of contract claims in Counts Two, Four, Six, and Eight.

Plaintiffs contend, however, that the same previously litigated facts establish the elements of

breach of contract as to these claims, and Defendants do not dispute that, as to the Guarantees,

the elements of liability for breach of contract have been met, except as to the St. Moritz

Guarantee (the Eight Count).

Defendants contend that the St. Moritz Guarantee is no longer in effect, having been

released by operation of the provisions of a 2006 First Modification of Guarantee that set forth

six conditions which, when satisfied, effected a release of that Guarantee.   Defendants assert

that all six conditions were met by 2009, effecting release.   As Plaintiffs argue in reply,

Defendants have offered no evidence to support the contention that these six conditions were

satisfied by 2009.   In paragraph 129 of their L. Civ. R. 56.1 Statement of Material Facts,

Plaintiffs assert that the modified St. Moritz Guarantee remains in full force and effect.

Defendants' responsive Statement of Material Facts disputes the factual assertion and refers to

the relevant Guarantee documents in the record, but does not cite any evidence as to the

satisfaction of the six conditions.   Federal Rule of Civil Procedure 56(c)(1) requires that a "party asserting that a fact cannot be or is genuinely disputed must support the assertion" by either citing evidence of record or showing that the adverse party has no evidence in support.   Plaintiff has the Guarantees themselves, but Defendants have cited no evidence in support of their claim that the conditions for the release of the St. Moritz Guarantee were met.   Because Defendants have failed to substantiate their factual assertion, pursuant to Rule 56(e)(2), the Court considers paragraph 129 of Plaintiffs' Statement of Material Facts to be undisputed for the purpose of this motion.

As to the claims for breach of the Guarantee agreements, Counts Two, Four, Six, and Eight, this Court finds that Plaintiffs, who bear the burden of proof at trial of breach of contract, have offered evidence that the Guarantees are valid contracts, and there is no dispute that Daibes has not paid the amounts demanded under the Guarantees by Plaintiff, which constitutes defective performance.   Defendants have failed to defeat Plaintiffs' motion for summary judgment as to liability for breach of contract on the claims for breach of the Guarantees.

Plaintiffs moved for summary judgment of liability for breach of contract on all claims in the Amended Complaint.   Plaintiffs have demonstrated that no material facts are in dispute and that they are entitled to judgment as a matter of law.   Plaintiffs' motion for summary judgment of liability for breach of contract on all claims in the Amended Complaint will be granted.

## II. Plaintiff's motion for summary judgment: damages

Plaintiff moves for summary judgment as to all damages to which it is entitled under the terms of the loans.   Plaintiff states that that the damages it seeks "include damages for unpaid loan principal, prepayment premiums, late fees, note-rate interest, default-rate interest, and advances and carveouts, and default interest thereon."   (Pl.'s MSJ Br. at 15-16.)   Plaintiff

specifically excludes attorney's fees from this motion.   Plaintiff's statement of the amounts of damages it seeks, taken from Voss Cert. Ex. 38, is attached to this Opinion as Appendix I.

This Court has found in favor of Plaintiff as to liability on its claims for breach of contract.   Moving parties with the burden of proof at trial bear the initial summary judgment "burden of supporting their motions 'with credible evidence . . . that would entitle [them] to a directed verdict if not controverted at trial.'"   In re Bressman, 327 F.3d 229, 237 (3d Cir. 2003) (quoting Celotex, 477 U.S. at 331.)   The contested damages in this case are set by two liquidated damages provisions in each relevant Note, as modified by the Partial Waiver Letter.   These provisions state formulas which are used to calculate the damages amounts.   As evidence that Exhibit 38 contains a correct statement of the damages amounts owed to Plaintiff under the terms of the Notes, Plaintiff offers the certification of Gregory Voss, Senior Director of Special Servicing for AEGON USA Realty Advisors, LLC, the authorized agent of Plaintiff.   Voss certified that Exhibit 38 contains a complete accounting of Defendants' indebtedness to Plaintiff under the Loans, as of November 30, 2020.   (Voss Cert. ¶¶ 123, 124.)   Plaintiff meets its initial summary judgment burden by citing this evidence that it has calculated the damages amounts due under the Loans in accordance with the provisions in the contracts.   The summary judgment burden then shifts to Defendants.

As both an affirmative defense to the breach of contract claims, and as their Counterclaims, Defendants contend that the liquidated damages provisions at issue are unenforceable as unreasonable under the law of the state specified in each Note's governing law provision.   As already stated, Defendants' brief in opposition to Plaintiff's motion for summary judgment incorporates by reference the contents of its brief in support of Defendants' motion for summary judgment, which contains a fuller statement of Defendants' arguments.   In that brief,

Defendants make this general statement about their case:

> The question whether the prepayment premium and default interest provisions in the Notes are reasonable, and thus enforceable, is one that is appropriate for summary judgment.   Specifically, the record here amply demonstrates that the monetary amounts these provisions give rise to bear no resemblance to the actual damages Plaintiff has sustained and are simply not reasonable when evaluated, as they must be, in light of the totality of the circumstances.

(Defs.' MSJ Br. at 9-10) (citation omitted).   This is Defendants' unenforceability case in a nutshell.   The following discussion will demonstrate that Defendants fail to defeat Plaintiff's motion for summary judgment on damages principally because their case is insufficient, as a matter of law, under the applicable state requirements for demonstrating the unenforceability of a liquidated damages provision.   More specifically, Defendants fail to establish their chief argument's foundation: their argument about actual damages requires evidence which could establish Plaintiff's actual damages.   Defendants offer no such evidence, offering, instead, at best, problematic evidence of estimates of what the actual damages *could* be.

 A.   Enforceability of the prepayment premium provisions

Except for the Third St. Moritz Note, each of the loan notes contains a prepayment premium provision.[6]   The parties do not dispute that "the amount of the prepayment premium due under each of the Notes is calculated based on a yield maintenance formula by which the present value of future payments due on the loan, using a discount rate that is a function of U.S. Treasuries having the same average life of the note, exceeds the prepaid amount."   (Pl.'s Resp. 56.1 Stmt. (Defs.' MSJ) ¶ 14.)   The discount rate is the yield for U.S. Treasury bonds having a duration based on the average remaining life of the loan through maturity, except for the First St. Moritz Note, which adds 25 basis points to the relevant Treasury rate.   Other than this increase

---

[6] The Third St. Moritz Note states: "This Note may be prepaid, in whole or in part, without premium or penalty."   (Reich Dec. Ex. L § 7.)

to the discount rate, the prepayment premium provision in the First St. Moritz note uses the same calculation method that is stated in the DGHA and Reb Oil Notes.

### 1.   The DGHA Note, under Georgia law

There is no dispute that the DGHA Note is governed by Georgia law.   Plaintiff contends that the prepayment premium provision is valid and enforceable under Georgia law   Plaintiff states that some Georgia courts have found prepayment premium provisions enforceable because they did not violate Georgia's usury statute, O.C.G.A. § 7–4–18, while others "have upheld prepayment provisions where the borrower failed to establish the provision was unconscionable." (Pl.'s MSJ Br. 23.)   Plaintiff states, in summary: "under either standard, the prepayment provision in the DGHA Note is enforceable."   (Id.)

Defendants begin the subsection in opposition with this statement:

> Though one would not know it from reading Plaintiff's Motion, the pertinent law in Georgia and Alabama, which govern the DGHA Note and the Reb Oil Note, respectively, is very much in accord with New Jersey.

(Defs.' Opp. to Pl.'s MSJ Br. 23.)   Defendants follow this with a discussion of Georgia (and Alabama) law that relies on entirely different legal principles than those cited by Plaintiff.   The parties thus disagree about the relevant Georgia and Alabama law.   The Court provides the following analysis to serve as a framework for the analysis of the legal issues.

Plaintiff moved for summary judgment as to: 1) an award of damages for breach of contract, pursuant to the prepayment premium provision of the DGHA note; and 2) Defendants' Counterclaim for declaratory judgment that the prepayment premium provision is unreasonable and therefore unenforceable.   Plaintiff contends that the provision is enforceable as neither usurious nor unconscionable under Georgia law.   Defendants, in opposition, do not challenge the award of prepayment premium damages on grounds of either usury or being unconscionable.

Instead, Defendants assert, as an affirmative defense, that the prepayment premium provision is unenforceable because it is unreasonable.   Plaintiff did not address this affirmative defense in its moving brief, nor was it required to do so, but now Defendants have asserted it.

In reply, Plaintiff argues, as to Georgia and Alabama: "it is undisputed that neither state applies the law of liquidated damages to prepayment premiums."   (Pl.'s MSJ Reply Br. 9.) This ignores that Defendants expressly disagreed on this point.   Moreover, in its moving brief, Plaintiff never expressly asserted that Georgia did not apply the law of liquidated damages to prepayment premiums, and it appears only as a possible implication when the brief is re-read with the benefit of hindsight and the reply brief.   It is unmistakable that Defendants' opposition brief argued the contrary point, that Georgia would apply the law of liquidated damages to prepayment premiums.   The Court finds that, at best, the briefs demonstrate only that neither party found a Georgia case which applied the law of liquidated damages to prepayment premiums.   Plaintiff has provided no support for the proposition that Georgia courts affirmatively *would* not apply the law of liquidated damages to prepayment premiums, despite there being clear case law that allows courts to find a liquidated damages provision unenforceable if it operates as a penalty.   Plaintiff does not persuade this Court that it has correctly applied Georgia law to the facts of this case.

Defendants contend that Georgia law is fairly similar to New Jersey law in regard to the test for enforceability of a liquidated damages provision.   Defendants cite MMA Capital, which makes clear that, on questions of whether a liquidated damages provision is enforceable or an unenforceable penalty, Georgia applies the familiar reasonableness principles stated in the Restatement (Second) of Contracts § 356.   MMA Capital Corp. v. ALR Oglethorpe, LLC, 336 Ga. App. 360, 363 (2016).   In MMA Capital, the Court of Appeals of Georgia cited a Georgia

Supreme Court case, <u>Aflac, Inc. v. Williams</u>, 264 Ga. 351, 354 (1994), which states the basic

principles.   In <u>Aflac</u>, the Georgia Supreme Court first cited the relevant Georgia statute: "If the

parties agree in their contract what the damages for a breach shall be, they are said to be

liquidated and, unless the agreement violates some principle of law, the parties are bound

thereby."   O.C.G.A. § 13-6-7.   Next, the Court formulated the enforceability standard as

follows:

> In deciding whether a contract provision is enforceable as liquidated damages,
> three factors must exist. The injury must be difficult to estimate accurately, the
> parties must intend to provide damages instead of a penalty, and the sum must be
> a reasonable estimate of the probable loss.   "A term fixing unreasonably large
> liquidated damages is unenforceable on grounds of public policy as a penalty."
> Restatement (Second) of Contracts, § 356 (1).

264 Ga. at 354.   Defendants also cite <u>Gwinnett Clinic, Ltd. v. Boaten</u>, 340 Ga. App. 598, 599

(2017), which applies the same standard stated in <u>MMA Capital</u> and <u>Aflac</u>.

Although this Court agrees with Defendants that the relevant Georgia law is similar to

New Jersey law, there are important differences, which are most apparent in reading <u>Caincare,</u>

<u>Inc. v. Ellison</u>, 272 Ga. App. 190, 192 (2005).   First, the inquiry under Georgia law focuses on

the circumstances at the time of contracting only, not at the time of breach:[7]

> The third prong of the test inquires whether the liquidated damage amount is a
> reasonable pre-estimate of the probable loss.   The following review of a sample
> of cases reveals that the touchstone question is whether the parties employed a
> reasonable method under the circumstances to arrive at a sum that reasonably
> approximates the probable loss of the defaulting party.

---

[7] Defendants assert that the third prong inquiry under Georgia law evaluates the reasonableness
of the estimate by looking at actual damages, which is incorrect.   It is contradicted by <u>Caincare</u>,
and the Georgia case cited by Defendants in support of this assertion does not support their
position: in the third prong analysis in <u>Allied Informatics v. Yeruva</u>, 251 Ga. App. 404, 406
(2001) (italics added), the Court looked only at "actual damages that *could be* incurred from a
breach," which refers to the pre-estimate of the loss, and not the actual damages/actual loss.
The decision states, and repeats, that the question before the Court is whether "the stipulated sum
is a reasonable pre-estimate of the probable loss."   <u>Id.</u> at 405.

Id. at 192-93 (citation omitted).  The Caincare Court concluded that neither party had presented evidence to "prove the parties took any steps to estimate the loss prior to the contract being signed," which supported the determination that the provision at issue was an unenforceable penalty.  Id. at 195.

Second, although Georgia law does not presume reasonableness as does New Jersey law, O.C.G.A. § 13-6-7 states that a litigated damages provision in a contract binds the parties unless contrary to law.  In addition, "the party who defaults on the contract has the burden of proving the liquidated damages clause is an unenforceable penalty."  Caincare, 272 Ga. App. at 192. The big difference lies in the treatment of close cases.  On this subject, the Court of Appeals of Georgia quoted the Georgia Supreme Court: "In cases of doubt, the courts favor the construction which holds the stipulated sum to be a penalty, and limits the recovery to the amount of damage[s] actually shown, rather than a liquidation of the damages."  Id. at 195 (quoting Fortune Bridge Co. v. Dep't of Transp., 242 Ga. 531, 532 (1978)).

To the extent that Defendants imply that Plaintiff bears some burden of proof that the provision is not a penalty, they are incorrect.  After describing the Aflac three-pronged standard, Defendants assert: "Unless all three criteria are met, such a clause is deemed a penalty."  (Defs.' Opp. to Pl.'s MSJ at 23).  That is correct, but it does not relieve the defaulting party from the burden of proving that, because the provision does not meet the standard for enforceability, it is an unenforceable penalty.

This Court has determined the principles of Georgia law to apply to a dispute over whether a liquidated damages contract provision is unenforceable as unreasonable.  In the instant case, such a dispute arises both from Defendants' affirmative defense to the breach of contract claim, as to the prepayment premium provision, as well as Defendants' Counterclaim

with regard to that same provision.

Next, the Court applies the correct Georgia law to Plaintiff's motion for summary judgment.   Plaintiff bears the burden of proof on its breach of contract claim and, as already discussed, it has met its initial summary judgment burden as to contract damages based on the prepayment premium provision.   Defendants bear the burden of proof on their affirmative defense and Counterclaim that the provision is unenforceable, and so, as to the affirmative defense and Counterclaim, Plaintiff is a moving party without the burden of proof.   "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."   Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).   Plaintiff has met that initial burden as well.   The summary judgment burden then shifts to Defendants.

Defendants bear the burden of proof as to their affirmative defense and on their Counterclaim.   If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."   Katz v. Aetna Cas. & Sur. Co., 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quoting Celotex, 477 U.S. at 322-23; Holloway v. AG United States, 948 F.3d 164, 168 n.1 (3d Cir. 2020).   Thus, to defeat Plaintiff's motion for summary judgment, Defendants must offer evidence sufficient to allow a jury to find in their favor at trial.

As to Defendants' actual argument that the prepayment premium provision in the DGHA note is unenforceable under Georgia law, it is presented in a single paragraph, here quoted in its

entirety:

> Put simply, the prepayment premiums in the DGHA and Reb Oil Notes, which together account for $5.1 million – 22% of their combined principal balance – are not enforceable, as a matter of law, for the same reasons outlined above vis-à-vis the Alexander and St. Moritz Notes (see supra at 21-22). These sums far surpass the actual damages that the record reveals Plaintiff has incurred as a result of prepayment and thus do not satisfy the third prong of the stipulated damages test. As a result, none of the prepayment premiums should be enforced and Plaintiff's motion for summary judgment should be denied.

(Defs.' Opp. to Pl.'s MSJ at 25).   As to the first sentence, this Court declines Defendants'

request to find the arguments it made about the Alexander and St. Moritz Notes, governed by

New Jersey law, and convert them into arguments about the DGHA Note, governed by Georgia

law.   New Jersey law and Georgia law are not the same; the Notes are not the same; there is no

dispute that gas stations are different from apartment buildings.   Defendants must construct and

present their arguments accordingly; this Court will not do it for them.   As to the second

sentence, as already discussed, this Court rejects Defendants' contention that the third prong of

the Aflac standard involves comparison to actual damages.[8]   "The third prong of the test inquires

whether the liquidated damage amount is a reasonable pre-estimate of the *probable* loss."

Caincare, 272 Ga. App. at 192 (italics added).   Moreover, in MMA Capital, Defendants'

principal Georgia case, the Court of Appeals of Georgia specifically barred this argument: "The

breaching party cannot complain that the actual damages are less than those specified as

liquidated damages."   MMA Capital, 336 Ga. App. At 366 (quoting Se. Land Fund, Inc. v.

Real Estate World, Inc., 237 Ga. 227, 230 (1976).   Defendants have offered no basis for this

Court to find that the liquidated damage amount is not a reasonable pre-estimate of the probable

---

[8] Defendants' brief in opposition incorrectly contends that Alabama law and Georgia law assign the same role to actual damages in the reasonableness analysis.   In support, however, Defendants cite only cases decided under Alabama law and do not cite any Georgia cases that support their position.

loss.

Defendants bear the burden of proof of unenforceability under Georgia law and have failed to offer any basis for this Court to find that the prepayment premium provision of the DGHA Note is an unenforceable penalty under Georgia law.   As to Defendants' affirmative defense of unenforceability, and Counterclaim for a declaration of unenforceability, Defendants have failed to meet their burden to defeat Plaintiffs' motion for summary judgment of damages pursuant to the prepayment premium provision of the DGHA Note.

### 2.   *The Reb Oil Note, under Alabama law*

This Court's analysis of Plaintiff's motion for summary judgment as to the prepayment premium provision of the Reb Oil Note, governed by Alabama law, proceeds similarly, and will be explained more briefly.   Again, Plaintiff describes Alabama law without reference to the relevant law of enforceability of liquidated damages provisions.   As already stated, Plaintiff's reply brief makes this groundless assertion: "it is undisputed that neither state applies the law of liquidated damages to prepayment premiums."   (Pl.'s MSJ Reply Br. 9.)   Defendants, in opposition, briefly state the applicable Alabama law regarding liquidated damages as unenforceable penalties, relying principally on Autauga Quality Cotton Ass'n v. Crosby, 893 F.3d 1276, 1280 (11th Cir. 2018), which offers a good summary of the applicable law:

> The general common-law rules regarding liquidated damages are well-settled. Under Alabama law, bona fide liquidated-damages provisions—which prescribe "a sum to be paid in lieu of performance"—are enforceable, but "penalty" clauses—which impose "a security for the performance of the agreement or ... a punishment for default"—are void. *Camelot Music, Inc. v. Marx Realty & Imp. Co.*, 514 So. 2d 987, 990 (Ala. 1987).   The trick, of course, is distinguishing between the two.   Helpfully, Alabama courts have identified three essential markers of a valid liquidated-damages provision: "First, the injury caused by the breach must be difficult or impossible to accurately estimate; second, the parties must intend to provide for damages rather than for a penalty; and, third, the sum stipulated must be a reasonable pre-breach [estimate] of the probable loss."   *Id.* If any one of these three criteria isn't satisfied, "the clause must fail as a penalty."

28

*Milton Constr. Co. v. State Highway Dep't*, 568 So. 2d 784, 790 (Ala. 1990).

Thus, there are similarities to the relevant law of Georgia, but there is one important difference

relevant to Defendants' arguments here: in Alabama, the third prong of the standard is applied

differently.   Defendants aptly cite another Eleventh Circuit case which describes the key

difference in Alabama law and exemplifies its application:

> In this case, the damages clauses in paragraphs 2(c) and 6 clearly fail the third
> criterion--that the sum stipulated be a reasonable pre-breach estimate of the
> probable loss. This third criterion "is applied after the fact and measures whether
> the sum stipulated … bears a rational relation to the injury incurred." *Milton
> Construction*, 568 So. 2d at 791.   The Listing Agreement provides for a full
> commission plus costs and expenses if AG breaches the Listing Agreement.
> Without doubt, allowing Southpace to recover a commission plus costs and
> expenses for AG's breach would overcompensate Southpace for the injury it
> suffered.   In fact, Southpace could recover more upon AG's breach, without
> having located a ready and willing buyer, than if Southpace had actually sold the
> property for the listing price of $ 1.6 million.   This results in "disproportionate,
> unreasonable compensation."   *See Milton Construction*, 568 So. 2d at 791.
> Thus, we conclude that the sum stipulated is an unreasonable pre-breach estimate
> of the probable loss.   Having determined that at least one of the three criteria is
> not met, we hold that the district court did not err in ruling that paragraphs 2(c)
> and 6 of the Listing Agreement are void as penalty clauses.

Southpace Props., Inc. v. Acquisition Grp., 5 F.3d 500, 505-06 (11th Cir. 1993).   This is

important in considering Defendants' single sentence applying the standard, which is: "These

sums far surpass the actual damages that the record reveals Plaintiff has incurred as a result of

prepayment and thus do not satisfy the third prong of the stipulated damages test."   (Defs.' Opp.

to Pl.'s MSJ at 25).

As Southpace demonstrates, in analyzing the third prong, Alabama courts compare actual

damages with the liquidated damages amount.   The Southpace Court made this comparison and

concluded that the provision had resulted in compensation that was disproportionate and

unreasonable.   The big differences between the Eleventh Circuit's analysis and Defendants'

single sentence are that the Eleventh Circuit supported the conclusion with a reasoned analysis

and explanation, and the evidence of record established the amount of actual damages.   This included arriving at the determination that the operation of the liquidated damages provision in question provided greater compensation for breach than for performance, which the Court concluded was disproportionate and unreasonable.   See also Autauga, 893 F.3d at 1282 (11th Cir. 2018) (concluding, based on an analysis of the facts, that "[t]he liquidated-damages figure vastly exceeds anything that Autauga could even possibly have lost as a result of the Crosbys' alleged breach.)   All Defendants have done here is claimed that the liquidated damages are much greater than the actual damages, without any explanation.[9]   Defendants have offered no analysis of the relevant evidence, and no reasoning, but merely a conclusory assertion that, because the liquidated damages far exceed the actual damages, the third prong of the test is not met.

Furthermore, as will be established in the discussion of Defendants' case under New Jersey law, Defendants have no admissible evidence of the actual lost yield damages.   This Court holds, as a matter of law, that Defendants have no case that the relevant provisions fail to meet the requirements of the third prong under Alabama law.   Defendants have failed to offer evidence that the third prong of the reasonableness analysis has not been satisfied.

"Determining whether a liquidated damages provision is valid is a question of law to be determined by the trial court based on the facts of each case."   Camelot Music, Inc. v. Marx Realty & Improv. Co., 514 So. 2d 987, 990 (Ala. 1987).   Defendants do not contend that they can make a case under the first or second prong but, even if this Court looks to Defendants' arguments under New Jersey law, Defendants have made no arguments about parallel issues.

---

[9] "[I]t is not the function of this Court to do a party's legal research or to make and address legal arguments for a party based on undelineated general propositions not supported by sufficient authority or argument."   Butler v. Town of Argo, 871 So. 2d 1, 20 (Ala. 2003).

This Court concludes as a matter of law that Defendants have failed to make any showing that the premium prepayment provision of the Reb Oil Note is an invalid penalty.   Their affirmative defense and Counterclaim of unenforceability suffer from a complete failure of proof.   As to the premium prepayment provision of the Reb Oil Note, Defendants have failed to defeat Plaintiff's motion for summary judgment.

> 3.   *The Alexander Note and the First St. Moritz Note, under New Jersey law*

The Alexander Note and the St. Moritz Notes are governed by New Jersey law; the Third St. Moritz Note does not have a prepayment premium provision.   The parties are mostly in agreement about the applicable New Jersey law, relying on the principles set forth by the New Jersey Supreme Court in Wasserman's v. Twp. of Middletown, 137 N.J. 238, 257 (1994), and in MetLife Capital Fin. Corp. v. Wash. Ave. Assocs. L.P., 159 N.J. 484, 501 (1999).   The New Jersey Supreme Court has established the following fundamental principles.   "[L]iquidated damages provisions in a commercial contract between sophisticated parties are presumptively reasonable and the party challenging the clause bears the burden of proving its unreasonableness."   MetLife, 159 N.J. at 496.   "New Jersey courts have viewed enforceability of stipulated damages clauses as depending on whether the set amount is a reasonable forecast of just compensation for the harm that is caused by the breach and whether that harm is incapable or very difficult of accurate estimate."   Wasserman's, 137 N.J. at 250.   "[T]he overall single test of validity is whether the stipulated damage clause is reasonable under the totality of the circumstances."   MetLife, 159 N.J. at 495.

> Treating reasonableness as the touchstone, we [have] noted that the difficulty in assessing damages, intention of the parties, the actual damages sustained, and the bargaining power of the parties all affect the validity of a stipulated damages clause.   We did not, however, consider any of those factors dispositive.

Id. (citation omitted).   "[T]he reasonableness test is applied either at the time the contract is

31

made or when it is breached."  Id. at 502.  "The decision whether a stipulated damages clause is enforceable is a question of law for the court".  Wasserman's, 137 N.J. at 257.

While the actual damages sustained is one possible consideration among several in the "totality of the circumstances test," it can strongly influence a decision:

> Actual damages, moreover, reflect on the reasonableness of the parties' prediction of damages. If the damages provided for in the contract are grossly disproportionate to the actual harm sustained, the courts usually conclude that the parties' original expectations were unreasonable.

Id. at 251.  This opens the door to the possibility that a party could use evidence of actual damage sustained to show that a liquidated damages amount is disproportionate and, therefore, the provision is unreasonable both at the time of breach and also at the time of contracting.

As Plaintiff argues in opposition to Defendants' motion for summary judgment, Defendants cannot prevail on their arguments of unreasonableness under New Jersey law because they did not even assert that the prepayment premium provisions were unreasonable from the perspective of the time the contract was made.   In their reply brief, Defendants attempt to remedy the omission, arguing for the first time that the provisions in the Alexander Note and First St. Moritz Note were unreasonable at origination.   As to the Alexander Note, Defendants argue that Plaintiff's partial waiver of the prepayment premium provision in 2018 is evidence that the provision as originally drafted was unreasonable.   As to the First St. Moritz Note, Defendants contend that the fact that the provision uses a discount rate that is 25 basis points higher than that used in the other notes shows that Plaintiff knew that the First St. Moritz Note provision was unreasonable at origination.[10]   This Court need not explain why it finds these

---

[10]  And yet, as Plaintiff points out, in loan modification agreements in 2014, Defendants agreed, without objection, to the payment of a prepayment premium in the amount of $2.5 million, calculated using the formula in the First St. Moritz Note.

arguments unpersuasive, because they are procedurally improper, as arguments raised for the first time in a reply brief.   As a matter of procedure, this Court will not accept arguments offered for the first time in a reply brief, as they were not properly asserted in the opening brief and the opposing party has not had the opportunity to respond to them.   Anspach v. City of Philadelphia, 503 F.3d 256, 258 n.1 (3d Cir. 2007) ("failure to raise an argument in one's opening brief waives it.")   Nor did Defendants argue that the provisions were unreasonable at origination in their brief in opposition to Plaintiff's motion for summary judgment.

Defendants argue that the prepayment premium provisions in the Alexander and First St. Moritz Note are unenforceable as unreasonable on three grounds: 1) the amount charged is markedly higher than other prepayment premium amounts Plaintiff received between 2005 and 2019; 2) the calculation uses a discount rate based on U.S. Treasury notes, but in actual fact, Plaintiff rarely invests in U.S. Treasury notes; and 3) Defendants question Plaintiff's characterization of the contracts as "freely negotiated" and contend that "Plaintiff led Mr. Daibes to believe that no prepayment premiums would ever be charged."   (Defs.' Opp. Br. at 22.)

Plaintiff contends that the Court should consider these arguments only under New Jersey's liquidated damages/unenforceable penalty analysis.   This Court agrees.   To the extent that Defendants appeal to the Court to invoke its powers of equity, New Jersey law places this constraint: "the settled precedent is that in the absence of fraud, accident, or mistake, a court of equity cannot change or abrogate the terms of a contract."   Dunkin' Donuts of Am., Inc. v. Middletown Donut Corp., 100 N.J. 166, 183 (1985).

Defendants' first argument entails a grab-bag of assertions which attempt, generally, to show that the dollar amounts of the prepayment premiums at issue here are larger than various things allegedly drawn from the history of prepayment premiums charged by Plaintiff on other

33

loans over the past 15 years: for example, the prepayment premium on the Alexander Note is 19 times the average prepayment premium Plaintiff received in a 15-year period.   The Court has no basis to consider these relevant or meaningful.[11]   First, these statistics do not adjust for the size of the loan balance that was prepaid.   Furthermore, statistics which compare the total premium amounts charged, shed no light on the true focus of the parties' dispute over the lost yield calculation in this case, which is the discount rate used to calculate the premiums.   Defendants say nothing about what discount rates were written into the prepayment premium provisions in the comparison group of loan contracts.   Nor does this argument have relevance to any of the considerations that the New Jersey Supreme Court has identified as important in the reasonableness analysis.[12]

Crucially, this historical argument lacks a foundation in evidence: as Plaintiff argues in

---

[11] As Plaintiff argued in the brief in opposition to Defendants' motion for summary judgment:

> Comparing the absolute dollar amounts of the premiums calculated under the Notes to those from other loans made by Plaintiff at other times to other borrowers does not account for individualized variables affecting the calculation under the formula, specifically: the prepaid principal amount, remaining time to maturity, and change in the interest rates since origination.

(Pl.'s Opp. Br. to Defs.' MSJ at 10.)

[12] Defendants' opposition brief does not attempt to connect this argument to anything in New Jersey law, but cites Defendants' brief in support of its motion for summary judgment.   In that brief, Defendants cite MetLife in support of this argument.   On the cited page of MetLife, however, the Court pointed to three factors which supported the determination that a default interest rate was reasonable.   159 N.J. at 502.   One factor was that the rate "falls well within the range demonstrated to be customary," which refers to this preceding statement: "MetLife presented evidence that industry custom provides for default rates of fifteen percent to eighteen percent."   Id. at 501, 502.   Defendants' comparative assertions in the instant case are totally different, apples to oranges: rather than compare the discount rate used to calculate the prepayment premium to customary discount rates used similarly in the industry, which would be similar to what was done in MetLife, Defendants here compare the prepayment premium amounts at issue to premium amounts on a subset of Plaintiff's prior loans, which is very different than the approach that was approved in MetLife.

the brief in opposition to Defendants' motion for summary judgment, these arguments rely on factual assertions not made in any L. Civ. R. 56.1 Statement.   The paragraph making this argument in Defendants' opposition brief cites to no evidence of record, but only to Defendants' moving brief in support of its motion for summary judgment.   The cited pages in that moving brief cite exhibits FF, GG, and HH in support of the statistical assertions.   These exhibits contain only many pages of spreadsheets containing raw data about different loans.   In short, Defendants have offered no evidentiary support for these assertions of statistical facts, as required by Rule 56(c)(1).   The statistical assertions are unsupported.

In addition, Plaintiff responds that Defendants' comparison of the prepayment premiums at issue to premiums charged to other customers over a 15-year period suffers from a major flaw: it does not take into account the fact that interest rates on Treasury bonds have dropped significantly over this period.   This Court takes judicial notice of the chart of the long-term history of an index of 10-year Treasury bond interest rates, published by the Federal Reserve Bank of St. Louis.[13]   This chart confirms what Plaintiff contends: while the drop has not been a straight line down, the general Treasury bond interest rate trend over the past 15 years has been down, and, roughly speaking, there has been a big drop between 2005 and 2020.   As Plaintiff contends, given the role of Treasury bond rates in the prepayment premium formula, lower interest rates mean higher prepayment premiums.   Defendants' argument based on history fails to take this into account.

As their second point, Defendants argue that, at the time of prepayment, the actual lost yield damages can be calculated, using as the discount rate the lender's current rate of return on

---

[13] "10-Year Treasury Constant Maturity Rate," Federal Reserve Bank of St. Louis, https://fred.stlouisfed.org/series/DGS10 (last visited April 3, 2021).

its investments on that date, which may be ascertained.   (See Defs.' MSJ Br. at 19-20.)   This

argument challenges the discount rate used to calculate the prepayment premium and argues that,

because the discount rate is lower than the yield Defendants predict Plaintiff would earn from

reinvesting the prepayment premium, the provision greatly overcompensates the lender.

      This argument is problematic from the start because it is only beneficial to assert it at a

moment in time when, as now, Treasury bond interest rates are so low, and have dropped well

below the reported rate of return on Plaintiff's investment portfolio in 2018.   The fundamental

observation – the relationship of those two rates at the time of prepayment – may be strongly

supported by the evidence, but Defendants do not persuade this Court that this is a measure of

Plaintiff's actual lost yield damages.

      Defendants' argument rests on the fallacious predicate that actual lost yield damages can

be fixed at the time of prepayment even when the future composition of the reinvestment

portfolio until the maturity date of the loan is unknown, and when Plaintiff has historically

preferred investments with varying degrees of investment risk.   This is a fallacy: Defendants do

not and cannot know now what Plaintiff's investment portfolio will be or what it will earn in the

future.   Only if Plaintiff invests in something with a guaranteed rate of return – which

Defendants agree has been a little-favored investment for Plaintiff –, and which can be liquidated

at the maturity date of the loan, can one accurately predict future return on investment at the time

of prepayment.   Commercial real estate loans – as this case itself demonstrates – do not appear

to offer a guaranteed rate of return to the lender.   Defendants do not acknowledge the realities of

risk and uncertainty that their theory eliminates.   Defendants claim to have ascertained the

actual damages from lost yield, when in fact they have offered only an optimistic estimate of a

predictable future, based on the implausible assumption that what happened to Plaintiff in 2018

will happen reliably, year after year, until time reaches the maturity date of the loans.   This Court rejects Defendants' contention that this analysis is evidence of the actual damages from lost yield, evidence which demonstrates that the prepayment premium provisions overcompensate Plaintiff.   Defendants do not offer more than an estimate, based on unreasonable assumptions, of what the actual lost yield damages will be.

Nor would the evidence of Plaintiff's general investment rate of return from any past period be admissible for the purpose of establishing Plaintiff's actual lost yield damages.   Past investment performance does not predict future investment performance.   Even if it were considered to be weakly probative, the evidence would be inadmissible under Federal Rule of Evidence 403, as its probative value is substantially outweighed by a danger of confusing the issues.

Defendants argue that the prepayment premium calculation uses a discount rate based on U.S. Treasury notes, and that it is somehow problematic that, in actual fact, Plaintiff rarely invests in U.S. Treasury notes.   It may be true that Plaintiff rarely invests in Treasury bonds, but Plaintiff does not persuade that one has anything to do with the other.[14]   Plaintiff's preferred investments in recent years have no relevance to Defendants' theory that prepayment premium amounts are disproportionate to actual damages.   Nor have Defendants even attempted to demonstrate that the use of the Treasury rate as the discount rate in the prepayment premium provisions results in an unreasonable estimate of the actual damages, either from the perspective of the time of contracting, or the time of prepayment.   There is no basis to find this evidence of Plaintiff's past investment strategies to be relevant.

---

[14] If anything, this fact supports the proposition that Plaintiff tends to invest in assets with greater risk, which makes their future performance more difficult to predict.

Defendants offer the testimony of Frank Coe, a former employee of Plaintiff, and the expert report of Gregory McManus to support their contention that actual lost yield damages may be calculated on the prepayment date based on Plaintiff's current rate of return on its investments.   Generally, the cited paragraphs in the McManus Report support Defendants' position.   (Reich Dec. Ex. PP ¶¶ 43, 44.)   Nonetheless, the McManus Report merely offers a more detailed version of the unacceptably flawed argument just described: the McManus Report offers a model for estimating future lost yield damages based on what happened in 2018.   It is very unlikely to be admitted at trial as it would mislead and confuse the jury on the matter of actual lost yield damages.   No expert will be allowed to tell a jury that he or she has ascertained events that are years in the future; such testimony will not pass muster under Daubert, which assigns to this Court "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."   Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993).

Defendants also cite deposition testimony by Frank Coe in support of the proposition that the yield-maintenance formula "*can* result in a sum that is greater than required to compensate for the yield that is foregone."   (Defs.' MSJ Br. at 16; italics added.)   Defendants do not claim that Coe's testimony supports the proposition that the prepayment premium formula *does necessarily* overcompensate, merely that it can.   This does not support Defendants' claim to have ascertained the actual lost yield damages at the time of prepayment, and to have determined that the prepayment premium provisions overcompensate Plaintiff.   In fact, Coe's testimony is contrary to Defendants' argument:

> Q: [W]ould it have been more appropriate to use Aegon's reinvestment rate as the discount rate, as opposed to a Treasury rate?
> A. And my answer is also that's just as ambiguous, you know, because we don't know at all what that is in the future.

Q. Well, you don't know what the reinvestment rate is in the future when you enter into the prepayment of the loan document that contains the prepayment premium, but you certainly do know at the time that the prepayment premium would be applied. Correct?
A. Yes.

(Reich Dec. Ex. B 98:1-18.)   Coe clearly points out the flaw in Defendants' position: using the reinvestment rate as the discount rate is "ambiguous . . . because we don't know at all what is in the future."   All that Coe agreed to is that, at the time of prepayment, one can know the lender's current rate of return on its investments.

Defendants' third argument questions Plaintiff's characterization of the contracts as "freely negotiated" and asserts that Plaintiff led Mr. Daibes to believe that no prepayment premium would ever be charged.   Defendants cite no law in support in the brief in opposition to Plaintiff's motion for summary judgment.   This Court cannot discern the connection between these points and New Jersey's law of unreasonableness of liquidated damages provisions. Moreover, there is no dispute that Daibes is an experienced real estate developer, represented in all of these transactions by counsel, and his counsel furnished opinion letters at the closing of each Loan, stating that each loan document was valid and enforceable.   (See Defs.' Resp. 56.1 Stmt. ¶¶ 8, 41, 42.)

In support of their affirmative defense and Counterclaim, Defendants have offered three arguments that the prepayment premium provisions in the Alexander and St. Moritz Notes are unenforceable as unreasonable.   This Court has considered these arguments and finds them insufficient to demonstrate unreasonableness under New Jersey law.   First, Defendants failed to even argue, prior to their reply brief, that the provisions were unreasonable when viewed from the perspective of the time of origination; this alone precludes finding the provisions unreasonable.   Second, as to the arguments that address the analysis from the perspective of the

39

time of breach, Defendants raise no points supported by evidence that are relevant to the unreasonableness inquiry applied by New Jersey courts to challenges to liquidated damages provisions.   Defendants' claim to have ascertained actual damages at the time of prepayment rests on passing off an estimate of future damages, based on unreasonable assumptions, not on a true determination of lost yield, which, unless Plaintiff invests in something with a guaranteed rate of return, like Treasury notes, will unfold unpredictably in the future.   Defendants have failed to demonstrate that they have any support for their affirmative defense and Counterclaim under New Jersey law.   As to the prepayment premium provisions in the Alexander Note and Remaining St. Moritz Notes, Defendants have failed to defeat Plaintiff's motion for summary judgment.

B.  Enforceability of the default interest rate provisions

Each of the loan notes contains a default interest provision.   The parties agree to this statement: "Each of the Loans at issue contains a default interest provision requiring the borrower-Defendant to pay an interest rate above the contract rate on the outstanding principal following a default."   (Pl.'s 56.1 Stmt. ¶ 115; Defs.' Resp. 56.1 Stmt. ¶ 115.)   This increase in the interest rate after default will be called "the Default Interest Increment."   The parties agree that, for the Remaining St. Moritz Notes, the Default Interest Increment is 5%, and that, for the DGHA Note and Reb Oil Note, because of the Partial Waiver Letter, the effective Default Interest Increment is 10%.   The parties do not agree about the Default Interest Increment for the Alexander Note: Plaintiff states that it is 5%, and Defendants agree only that the rate of interest after default is 11.16%.[15]

---

[15] A table of information in the brief in support of Defendants' motion for summary judgment states that the Alexander Note's Default Interest Increment is 5%.   (Defs.' MSJ Br. at 7.)

As to the applicable law of the different states, Plaintiff differentiates the state laws, essentially repeating the arguments, discussed above, in regard to the prepayment premium provisions.   Defendants contend that, as to the default interest provisions, there is no need to differentiate the laws of New Jersey, Georgia, and Alabama.   As will be explained below, this Court need not resolve the parties' dispute over the applicable state law.

In considering Plaintiff's motion for summary judgment as to default interest rate damages, the Court applies the same procedural framework that it used in regard to the prepayment premium damages.   Plaintiff has moved for summary judgment as to: 1) an award of damages for breach of contract, pursuant to the default interest provisions of the Notes; and 2) Defendants' Counterclaim for declaratory judgment that the default interest provisions are unreasonable and therefore unenforceable.   This Court has found in favor of Plaintiff as to liability on its claims for breach of contract, and Plaintiff has offered evidence that the default interest damages it seeks are calculated according to formulas stated in provisions of the contracts which have already been found to be valid and breached.   As before, the summary judgment burden now shifts to Defendants.

Defendants premise their case in opposition on the undisputed proposition that default interest compensates the lender for losses incurred in the event of a default.   (Pl.'s 56.1 Stmt. ¶ 121; Defs.' Resp. 56.1 Stmt. ¶ 121.)   Defendants make three arguments in opposition.   First, Defendants contend that the total default interest sought by Plaintiff is "grossly disproportionate" to the actual damages sustained.   (Defs.' Opp. Br. at 27.)   Second, other considerations weigh against a finding of reasonableness.   Third, Defendants distinguish a few of Plaintiff's cases.

As to the argument that the total default interest sought by Plaintiff is "grossly disproportionate" to the actual damages sustained, Defendants predicate it on a foundation

formed by two insufficient points: 1) putative admissions by Plaintiff that appear to narrow the scope of the damages that the default interest provision is intended to forecast and compensate; and 2) the opinion of their expert McManus.

As to the first point, this part of the foundation is constructed from mischaracterizations. In the opposition brief, Defendants point first to two pages of Plaintiff's opening brief, pages 26 and 27, which, in short, do not say what Defendants say they say.   Defendants also refer to their brief in support of their motion for summary judgment, pages 20 through 24, which makes an assertion about Plaintiff's expert and then distorts it.   Defendants first assert: "Those losses, according to Plaintiff's expert, include direct labor costs, deferred maintenance costs, and sale discount costs."   (Defs.' MSJ Br. at 20.)   This is a correct description of what the expert wrote in his report.   Defendants also acknowledge that Plaintiff's expert referred to opportunity costs from increased capital requirements.   Defendants proceed to argue, however, that Plaintiff's expert <u>limited</u> the costs of default to only these four categories, which is incorrect.   In fact, the cited report, the Expert Report of Timothy J. Riddiough, Ph.D., dated June 30, 2020, shows that Defendants have picked out only a few of the costs which the expert identified as typical expenses arising from a loan default which default interest is intended to compensate.   (Reich Dec. Ex. DD ¶¶ 120-134.)   Defendants omitted, for example, these substantial cost areas identified by Riddiough: implied losses, capital charges, and increased cost of capital due to credit downgrade of the loan.   (<u>Id.</u> at ¶¶ 126-130.)   The Riddiough Report does not support Defendants' narrow view of the scope of the damages that default interest is intended to compensate, and it does not support Defendants' statements about the Report.

Defendants have shown no support for their constricted theories of the damages the

default interest provisions were intended to compensate for.[16]   Defendants' first argument has no merit.[17]

As to the second point, regarding their expert McManus, Defendants' opposition brief, citing their brief in support of their motion for summary judgment, states: "Defendants' expert concluded that these two categories of default costs total $3.3 million per year, or approximately $7 million to date."   (Defs.' Opp. Br. at 27.)   Defendants thus imply that they have evidence of Plaintiff's actual damages related to this provision.   Defendants' moving brief, however, does not support this, as it offers "Mr. McManus's calculation of what a reasonable amount of default interest *would be*, based on his extensive real-world experience in the commercial real estate workout and servicing space."   (Defs.' MSJ Br. at 23; italics added.)

Defendants attempt to conjure a battle of the experts, Riddiough vs McManus.   The bottom line is that neither expert even claims to know what actual damages Plaintiff has sustained as a result of the defaults.   The experts provide commentary, speculation, debate, and opinion about what the actual damages due to the defaults *might* or *ought* to be, but they shed no light on what they *actually are*.   Neither expert offers an opinion setting the amounts of the damages Plaintiff actually has suffered due to the defaults.   The expert reports both focus much more on the issue of whether the various provisions constitute reasonable *estimates*, from an

---

[16] Moreover, the briefs do not even agree on which costs are at issue: on page 27, Defendants' opposition brief states that Plaintiff's costs are "servicing and processing the defaulted loan" and an "increase in capital costs," while, on page 20 of Defendants' brief in support of their motion for summary judgment, Plaintiff's costs are "direct labor costs, deferred maintenance costs, and sale discount costs."

[17] Furthermore, as was demonstrated in the analysis of the prepayment premium provisions, it is only under Alabama law that a finding of a disproportionate relationship of liquidated damages to actual damages is by itself sufficient to change the outcome of the reasonableness analysis in this case.   This Court finds, as a matter of law, that Defendants have no evidence of the actual default interest damages for the Reb Oil Note.

43

economic point of view, of the probable damages.[18]   The figure of $7 million is an estimate by

McManus of what Plaintiff's damages should be, based on a narrow definition of the scope of

the damages that default interest is intended to compensate.   To the very limited extent that

either expert opinion of what the damages should be is relevant to the establishment of Plaintiff's

actual damages, the evidence would be inadmissible under Federal Rule of Evidence 403, as its

probative value is substantially outweighed by a danger of confusing the issues and misleading

the jury into thinking that the expert knows the true amount of Plaintiff's actual damages.

　　　With these two points, Defendants again attempt to pursue their strategy of challenging

the liquidated damages provisions as resulting in fees that are disproportionate to Plaintiff's

actual damages.   Defendants' arguments, however, serve as a smokescreen to obscure the fact

that Defendants have offered *no* admissible evidence of Plaintiff's actual damages in *any* of the

cost areas they identified.   Defendants have provided no evidentiary foundation for their

argument that the fees are disproportionate to the actual damages.

　　　Defendants next argue that the following considerations weigh against a determination of

reasonableness: 1) the Alexander and St. Moritz loans were fully performing when Plaintiff

elected to put them into default; 2) "default interest rates attached to double-digit-million loan

amounts like those here should be scrutinized more closely, regardless of whether the rate itself

is legally permissible" (Defs.' MSJ Br. at 25); and 3) Plaintiff is believed to have negotiated

default interest rate provisions only sometimes.   Defendants offer no law from any state that

shows that these considerations should be weighed in the reasonableness inquiry, nor illuminates

---

[18]  Although New Jersey law requires an inquiry into the question of whether the liquidated damages provision "is a reasonable forecast of just compensation for the harm that is caused by the breach," Defendants do not address that issue in making their unenforceability case. Wasserman's, 137 N.J. at 250.

how these considerations should be weighed in the inquiry, but one footnote cites two cases.   In

that footnote, Defendants assert that case law supports "the proposition that the reasonableness of

a default interest rate is properly evaluated not in isolation but by reference to the loan balance,

too."   (Defs.' MSJ Br. at 26 n.14.)   The two New Jersey cases Defendants cite in the footnote

do not state that proposition.

Moreover, as already stated in regard to the prepayment premium provisions, to the

extent that Defendants make these points to appeal to the Court to invoke its powers of equity,

New Jersey law places this constraint: "the settled precedent is that in the absence of fraud,

accident, or mistake, a court of equity cannot change or abrogate the terms of a contract."

Dunkin' Donuts, 100 N.J. at 183.

Defendants' third argument merely purports to challenge the applicability of a few of

Plaintiff's cases, arguing that they are not dispositive.   Defendants here, however, have

overlooked the most relevant and significant New Jersey case that Plaintiff relied on, MetLife.

In MetLife, the New Jersey Supreme Court discussed at length an issue of the reasonableness of

a default interest provision:

> [T]he three percent increase in this case is a reasonable estimate of the potential
> costs of administering a defaulted loan, and the potential difference between the
> contract interest rate and the rate that MetLife might pay to secure a commercial
> loan replacing the lost funds.   Default charges are commonly accepted as means
> for lenders to offset a portion of the damages occasioned by delinquent loans.   As
> with the costs of late payments, the actual losses resulting from a commercial loan
> default are difficult to ascertain. The lender cannot predict the nature or duration
> of a possible default given many possible causes of borrower delinquencies.   Nor
> is it possible when the loan is made to know what market conditions might be ten
> or fifteen years hence and, thus, what might be recovered from a sale of the
> collateral.   For example, a lender cannot know what its own borrowing costs will
> be if the borrower defaults in paying a loan in the future, nor accurately predict
> what economic return it will lose when the borrower fails to repay the loan on
> time or how much in costs it will incur if the property is foreclosed or the
> borrower files for bankruptcy.   Additional sums required in the context of
> collection activity, such as travel costs, expert fees and the costs of its loan

officers' involvement in collection activities are difficult to prove with respect to any specific loan at its outset.

. . .

Late charges and default interest provisions constitute a practical solution to the problem of pricing loans according to anticipated rather than actual performance and the difficulty in allocating and determining the costs and damages of late payments and default. The alternatives are economically inefficient or judicially impracticable.

. . .

MetLife suggests that in view of today's fiercely competitive marketplace and because the liquidated damages analysis is complicated and ambiguous, we should supplant the traditional liquidated damages analysis in the commercial loan context by modern contract analysis.   That late charge and default interest provisions are more properly characterized as variable-pricing provisions, a term of borrowing money, rather than as liquidated damages.   Courts also have recognized that default interest and late charge provisions are part of the pricing of commercial loans, and legitimately reflect the parties' agreement as to the increased risk of nonpayment that the lender bears upon the occurrence of a default.

Because default and late charges are not liquidated damages at all in the traditional sense, but are simply part of the pricing of commercial loans between sophisticated parties, MetLife asserts that in the absence of unconscionability or illegality, those charges should be enforced. We agree in today's competitive market that ordinarily such charges are part of the cost of doing business. We, however, prefer to incorporate that factor into the "reasonableness" test.

159 N.J. at 501-502, 504-505 (citations omitted).   This discussion places particular emphasis on assessing reasonableness of default interest provisions from the perspective of the time of contracting.   Defendants' failure to address this prong of the analysis in arguing for the unreasonableness of the default interest provisions under New Jersey law is particularly problematic.   The New Jersey Supreme Court also reflected on default interest provisions as a "practical solution" to two problems, one of which is the difficulty in determining the costs of default.   Id. at 504.   This may help explain why Defendants failed to present evidence of the actual costs due to default: they are difficult to determine.   Defendants have failed to present any evidence that the default interest amounts Plaintiff seeks are disproportionate to actual damages, and have failed to overcome the presumption in New Jersey law that a liquidated damages

46

provision in a commercial contract is reasonable.

As to the default interest provision in the DGHA Note, the application of Georgia law produces the same result.   As already established, Georgia law bars Defendants from asserting actual damages to demonstrate unreasonableness.   Defendants have made no attempt to demonstrate that the default interest amount is an unreasonable pre-estimate of the probable loss, as required by Georgia law.   Further, under Georgia law, "the party who defaults on the contract has the burden of proving the liquidated damages clause is an unenforceable penalty." Caincare, 272 Ga. App. at 192.   Defendants have neither met that burden nor presented any admissible evidence of actual damages to raise a question of material fact.

As to the default interest provision in the Reb Oil Note, the application of Alabama law produces the same result, for a different reason.   The record before this Court contains no basis for the Court to conclude that any of the three characteristics that distinguish a liquidated damages provision from an unenforceable penalty requires the determination that the provision is a penalty.   No questions as to material facts preclude this Court from finding, as a matter of law, that the default interest provision in the Reb Oil Note is enforceable.

C.  Property tax advances

Although Defendants' brief in opposition to Plaintiff's motion for summary judgment does not address the dispute over one category of damages, property tax advances, Defendants' opposition brief incorporates by reference the arguments in its briefs in support of Defendants' motion for summary judgment, in which they dispute this issue.

Defendants contend that Plaintiff seeks to recover property taxes it paid, prior to 2012, on the properties that secure the DGHA and Reb Oil Notes, in addition to default interest on these payments.   Defendants argue that Plaintiff first sought to collect these amounts when it

filed this lawsuit in 2018, and that any claim for these damages has lapsed under the applicable 6-year statute of limitations.   In opposition, Plaintiff argues that all of the relevant Notes and Modifications at issue in this case contain a provision which states that the borrower "waives any statute of limitation."   (See, e.g., DGHA Note § 15(b), Voss Cert. Ex. 9; Pl.'s Supp. 56.1 Stmt. in opp. to Defs.' MSJ ⁋ 38.)   Plaintiff's reply brief fails to dispute Defendants' contractual waiver argument, and this Court construes Defendants' non-response to be a concession that Plaintiff is correct: Defendants contractually waived the right to assert the defense of the statute of limitations.   As to the property tax advances, Defendants have failed to defeat Plaintiff's motion for summary judgment.

In conclusion, Defendants have not met the requirements under Third Circuit law for defeating Plaintiff's motion for summary judgment as to damages.   Defendants have not made the showing necessary, under Third Circuit law, to defeat Plaintiff's motion for summary judgment.   As explained in the discussion above, Defendants have not provided sufficient admissible evidence to allow a jury to find in their favor at trial on either their affirmative defense or their Counterclaims.   Defendants have failed to defeat Plaintiff's motion for summary judgment as to damages.

In the oft-cited case about the law of summary judgment, the Supreme Court held: "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).   As regards Plaintiff's motion for summary judgment awarding damages, this Court finds a complete failure of proof as to Defendants' case in support of their affirmative defense and Counterclaims.   Indeed, here the evidence is truly "so one-sided that one party must prevail as a matter of law."   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

In support of their affirmative defense and Counterclaims, Defendants relied principally on the argument that the amounts produced by the prepaid premium and default interest provisions were disproportionate to the actual damages Plaintiff sustained.   Yet Defendants offered no admissible evidence of Plaintiff's actual damages to support that position.   Instead, as evidence, Defendants have offered very little more than the report of their expert, McManus. As discussed above, McManus offers his expert opinion about estimates he has made of what Plaintiff's damages could be, might be, or should be.   This leaves Defendants comparing the estimates of damages in the original contracts with an expert's estimates of damages after breach; Defendants have neither acknowledged that this is what their case amounts to nor shown a reason to believe such an approach has validity under any applicable state law.

Moreover, in each of the three states of concern, the relevant law of liquidated damages carefully distinguishes between estimates of actual damages and the actual damages themselves. A key question in the reasonableness inquiry in all three states is whether the provision in the contract is a reasonable estimate of the probable loss.   Defendants have cited no case that asks whether the provision in the contract is a reasonable estimate of *a later estimate* of the probable loss, nor that gives an estimate made after breach a part to play in the inquiry.

Plaintiffs moved for summary judgment as to all claims in the Amended Complaint, as well as to Defendants' four Counterclaims, which seek declaratory judgments that the prepayment premium provisions and the default interest provisions are unenforceable as unreasonable.   Defendants failed to meet their burden to defeat the motion.   Plaintiff has shown that there is no genuine dispute as to any material fact, and that it is entitled to judgment as a matter of law.   Plaintiff's motion for summary judgment is granted in its entirety, and Judgment will be entered in Plaintiff's favor on Counts One through Four of the Amended Complaint and

Defendants' four Counterclaims.

Plaintiff offered evidence that Voss Certification Exhibit 38 contains a statement of the amounts of Defendants' indebtedness under the Loans, in accordance with the provisions of the Notes, as of November 30, 2020, as well as a statement of the amounts that Daibes owes under the Guarantees, as of the same date.   The calculations from this exhibit have been attached to this Opinion as Appendix I.     In opposition to Plaintiff's motion for summary judgment as to damages, Defendants asserted various affirmative defenses and Counterclaims, but did not otherwise challenge the accounting in Exhibit 38, nor offer any evidence that the accounting in Exhibit 38 is incorrect.   Plaintiff is awarded damages, in the amounts asserted by Plaintiff, and reflected in Appendix I to this Opinion, against Defendants for breach of the Notes, and against Daibes for breach of the Guarantees.   Judgment will be entered against the specific Defendant or Defendants appropriate to each Count in the Amended Complaint as detailed in Appendix I. Appendix I states the damages in nine intermediate sums, all calculated to include pre-judgment interest through November 30, 2020.   For each intermediate sum, Appendix I states a per diem interest amount; these per diem interest amounts total $62,691.93, the daily interest amount for each day subsequent to November 30, 2020 until the entry of Final Judgment.   Plaintiff is entitled to further per diem interest on said amounts until the entry of Final Judgment in the per diem interest amounts set forth in Appendix I for each Loan.

The grant of Plaintiff's motion for summary judgment moots nearly all of Defendants' motion for summary judgment, which seeks summary judgment on Defendants' Counterclaims, as well as on the property tax advances and attorneys' fees.   As to Defendants' motion for summary judgment on the Counterclaims, the Court has just granted Plaintiff's motion for summary judgment on the Counterclaims, and so Defendants' motion for summary judgment on

the Counterclaims is denied as moot.   Defendants also seek summary judgment as to the

property tax advances and attorneys' fees.   The Court's grant of Plaintiff's motion for summary

judgment as to damages, which included the property tax advances, moots this aspect of

Defendants' motion for summary judgment.

Plaintiff's motion for summary judgment specifically excluded the issue of attorneys'

fees.   The grant of Plaintiff's motion for summary judgment thus did not moot Defendants'

motion for summary judgment limiting the award of attorneys' fees.   Plaintiffs move for a

judgment that any award of attorneys' fees is capped pursuant to New Jersey Rule of Court 4:42-

9(a)(4).   In opposition, Plaintiff argues that, since no application for attorneys' fees has been

made, Defendants' motion to limit the award is premature.   This Court agrees.   The Supreme

Court has explained the ripeness doctrine as follows: "its basic rationale is to prevent the courts,

through avoidance of premature adjudication, from entangling themselves in abstract

disagreements."   Abbott Labs. v. Gardner, 387 U.S. 136, 148 (1967).   If this Court adjudicated

Defendants' motion for judgment limiting attorneys' fees in the absence of any application, it

would indeed entangle itself in an abstract disagreement.   Plaintiff's motion for summary

judgment, seeking a cap on attorneys' fees, is denied as unripe.   As to all other aspects of

Plaintiff's motion for summary judgment, it is denied as moot.


　　　　　　　　　　　　　　　　　__/s/ Stanley R. Chesler_____
　　　　　　　　　　　　　　　　　Stanley R. Chesler, U.S.D.J


Dated:   April 20, 2021

## APPENDIX I

(From Voss Cert. Ex. 38)

### SCHEDULE OF AMOUNTS OWED UNDER THE NOTES AND GUARANTEES*

**Count I - Against DGHA, RRA and LRC on DGHA Note**

| | |
|---|---|
| Principal Balance | $13,045,628.23 |
| Contract-Rate Interest (February 1, 2018 through November 30, 2020 (1,034 days) @ 6.74% per annum or $2,442.43 per diem) | 2,525,472.62 |
| Default-Rate Interest (June 16, 2018 through November 30, 2020 (899 days) @ 10.0% per annum or $3,623.79 per diem) | 3,257,787.21 |
| Sundry Advances for Property Taxes paid in December 2011 and January 2012 | 438,253.42 |
| Sundry Advance for Environmental and Engineering Report in 2015 Related to Proposed Cresskill Plaza Substitution of Collateral | 5,000.00 |
| Default Interest on Sundry Advances (June 16, 2018 through November 30, 2020 (899 days) @ 16.74% per annum or $206.11 per diem) | 185,292.89 |
| Prepayment Premium Amount | 2,810,968.29 |
| Late Fees | 37,379.23 |
| Credit for 5/3/18 Partial Payment | (73,272.95) |
| Credit for April 2019 – November 2020 Cash Collateral Sweeps* | (1,947,261.34) |
| **Total (as of November 30, 2020, plus interest of $6,272.33 per diem)** | **$20,285,247.60** |

**Count III - Against Reb Oil on Reb Oil Note**

| | |
|---|---|
| Principal Balance | $10,100,820.78 |
| Contract-Rate Interest (February 1, 2018 through November 30, 2020 (1,034 days) @ | 1,996,012.92 |

6.88% per annum or $1,930.38 per diem)

| | |
|---|---:|
| Default-Rate Interest (June 16, 2018 through November 30, 2020 (899 days) @ 10.0% per annum, or $2,805.78 per diem) | 2,522,396.22 |
| Sundry Advances for Property Taxes | 281,827.57 |
| Default Interest on Sundry Advances June 16, 2018 through November 30, 2020 (899 days) @ 16.88% per annum or $132.15 per diem) | 118,802.85 |
| Prepayment Premium Amount | 2,259,779.40 |
| Late Fees | 25,923.80 |
| Credit for 5/3/18 Partial Payment | (57,911.37) |
| Credit for April 2019 – November 2020 Cash Collateral Sweeps* | (1,507,148.61) |
| **Total (as of November 30, 2020, plus interest of $4,868.31 per diem)** | **$15,740,503.56** |

## Count V - Against RRA on Alexander Note

| | |
|---|---:|
| Principal Balance | $55,139,216.10 |
| Contract-Rate Interest (October 1, 2018 through November 30, 2020 (792 days) @ 6.16% per annum or $9,434.93 per diem) | 7,472,464.56 |
| Default-Rate Interest (November 9, 2018 through November 30, 2020 (753 days) @ 5.0% per annum or $7,658.22 per diem) | 5,766,639.66 |
| Sundry Advances for Property Taxes | 138,770.67 |
| Default Interest on Sundry Advances (January 28, 2019 through November 30, 2020 (673 days) @ 11.16% per annum or $43.02 per diem) | 28,952.46 |
| Prepayment Premium Amount | 11,416,002.24 |

| | |
|---|---|
| Credit for 11/10/18 Partial Payment | (574,525.00) |
| Credit for April 2019 – November 2020 Cash Collateral Sweeps* | (8,227,574.94) |
| **Total (as of November 30, 2020, plus interest of $17,136.17 per diem)** | **$71,159,945.75** |

## Count VII - Against RRA and PGA on Remaining St. Moritz Notes

First St. Moritz Note

| | |
|---|---|
| Principal Balance | $24,301,474.68 |
| Contract-Rate Interest (October 1, 2018 through November 30, 2020 (792 days) @ 6.24% per annum or $4,212.26 per diem) | 3,336,109.92 |
| Default-Rate Interest (November 9, 2018 through November 30, 2020 (753 days) @ 5.0% per annum or $3,375.20 per diem) | 2,541,525.60 |
| Prepayment Premium Amount | 3,964,890.13 |
| Credit for 11/10/18 Partial Payment | (250,976.19) |
| Credit for April 2019 – November 2020 Cash Collateral Sweeps* | (3,626,972.14) |
| **Total (as of November 30, 2020, plus interest of $7,587.46 per diem)** | **$30,266,052.00** |

Third St. Moritz Note

| | |
|---|---|
| Principal Balance | $3,500,000.00 |
| Contract-Rate Interest (October 1, 2018 through November 30, 2020 (792 days) @ 4.5% per annum or $437.50 per diem) | 346,500.00 |
| Default-Rate Interest (November 9, 2018 through November 30, 2020 (753 days) @ 5.0% per annum or $486.11 per diem) | 366,040.83 |
| Credit for 11/10/18 Partial Payment | (13,125.00) |

| | |
|---|---|
| Credit for June 2019 – November 2020 Cash Collateral Sweeps* | (522,435.97) |
| **Total (as of November 30, 2020, plus interest of $923.61 per diem)** | **$3,676,979.86** |

## Count II – Against Fred Daibes on DGHA Loan Payment and Carveout Guarantees

| | |
|---|---|
| Guaranteed Obligation | $4,375,000.00 |
| Contract Rate Interest (June 6, 2018 through June 30, 2020 (899 days) @ 6.74% per annum or $819.10 per diem) | 736,370.90 |
| Default Rate Interest (June 16, 2018 through November 30, 2020 (899 days) @ 10.00% per annum or $1,215.27 per diem) | 1,092,527.73 |
| Carveout Obligation for Property Taxes paid in December 2011 and January 2012 | 438,253.42 |
| Default Rate Interest on Carveout Obligation (June 16, 2018 through June 30, 2020 (899 days) @ 16.74% per annum, or $203.79 per diem) | 183,207.21 |
| **Total (as of November 30, 2020, plus interest of $2,238.16 per diem)** | **$6,825,359.26** |

## Count IV – Against Fred Daibes on Reb Oil Loan Payment and Carveout Guarantees

| | |
|---|---|
| Guaranteed Obligation | $3,375,000.00 |
| Contract Rate Interest (June 16, 2018 through November 30, 2020 (899 days) @ 6.88% per annum or $645.00 per diem) | 579,855.00 |
| Default Rate Interest (June 16, 2018 through November 30, 2020 (899 days) @ 10.00% per annum, or $937.50 per diem) | 842,812.50 |
| Carveout Obligation for Property Taxes | 281,827.57 |
| Default Rate Interest on Carveout Obligation (June 16, 2018 through November 30, 2020 (899 days) @ 16.88% | 118,802.85 |

per annum, or $132.15 per diem)

**Total (as of November 30, 2020, plus**          **$5,198,297.92**
**interest of $1,714.65 per diem)**

**Count VI –Against Fred Daibes on Alexander Loan Payment and Carveout Guarantees**

| | |
|---|---|
| Guaranteed Obligation | $55,000,000.00 |
| Contract Rate Interest (November 9, 2019 through November 30, 2020 (753 days) @ 6.16% per annum or $9,411.11 per diem) | 7,086,565.83 |
| Default Rate Interest (November 9, 2018 through November 30, 2020 (753 days) @ 10.00% per annum, or $7,688.89 per diem) | 5,789,734.17 |
| Carveout Obligation for Property Taxes Paid in 2019 | 138,770.67 |
| Default Rate Interest on Carveout Obligation (January 28, 2019 through November 30, 2020 (673 days) @ 11.16% per annum or $43.02 per diem) | 28,952.46 |
| **Total (as of November 30, 2020, plus interest of $17,143.02 per diem)** | **$68,044,023.13** |

**Count VIII – Against Fred Daibes on Remaining St. Moritz Loans Payment Guarantee**

| | |
|---|---|
| Guaranteed Obligation | $15,400,000.00 |
| Contract Rate Interest (November 9, 2018 through November 30, 2020 (753 days) @ 5.00% per annum or $2,138.89 per diem) | 1,610,584.17 |
| Default Rate Interest (November 9, 2018 through November 30, 2020 (753 days) @ 6.24% per annum, or $2,669.33 per diem) | 2,010,005.49 |
| **Total (as of November 30, 2020, plus interest of $4,808.22 per diem)** | **$19,020,589.66** |

- - - - - - - - - - - - - - - - - - - - - - -

\* The net amount of the Cash Collateral Sweep Payments of $15,831,393 (consisting of the cash sweeps of $17,663,000 minus the property tax true-up and escrow payments totaling $1,831,607) received April 2019-November 2020, which is shown as a credit above, was allocated to the loans pro rata based on the outstanding principal balances as follows: Atlanta/DGHA Loan – 12.30%; Reb Oil Loan – 9.52%; Alexander Loan – 51.97%; First St. Moritz Loan – 22.91%; and Third St. Moritz Loan – 3.30%.